UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05CV 11841    G

```
                                           )
NEW CINGULAR WIRELESS PCS LLC,             )
                            Plaintiff,     )
                                           )
      v.                                   )
                                           )
TOWN OF NORTH ANDOVER, MASSACHUSETTS,      )
BOARD OF APPEALS of the TOWN OF NORTH      )
ANDOVER, ELLEN McINTYRE, RICHARD J. BYERS, )
ALBERT P. MANZI III, JOSEPH D. LaGRASSE,   )
DAVID R. WEBSTER, DANIEL S. BRAESE,        )
THOMAS D. IPPOLITO, RICHARD M. VAILLANCOURT,)
as they are members and associate members of the Board, )
                            Defendants.    )
                                           )
```

## **AMENDED COMPLAINT**

1.      New Cingular Wireless PCS LLC ("Cingular") appeals under both federal and

state law from the North Andover Board of Appeals' ("Board") denial, by a 2 – 2 vote, of

Cingular's application for a variance for a proposed wireless communication facility. The

proposed facility would be on an existing, guyed, orange-and-white-striped lattice

communications tower at 300 Chestnut Street, North Andover, MA (also known as 0 Chestnu

Street, Assessors Map 98C, Lot 2) ("Site"). The proposed facility would cover over 1.2 squar

miles of an undisputed gap in coverage on a major road and surrounding neighborhoods.

Attached hereto as Exhibit A is a copy of the certified copy of the Board's Decision filed with    e

North Andover Town Clerk on August 23, 2005. (The original certification was filed with the

original Complaint.)

2.      Cingular seeks relief pursuant to Section 704 of the Telecommunications Act c

1996, Pub. L. No. 104-104 ("the Telecommunications Act"), codified at Section 332(c)(7) of

Communications Act of 1934, 47 U.S.C. §§ 151-691, and the Massachusetts Zoning Act, M.(
c. 40A, § 17.

3. Cingular also seeks declarations invalidating Section 8, paragraph 8.9(3)(c)(v)
the North Andover Zoning Bylaw ("Bylaw") (600' minimum distance to lot line), on its face
as applied to the proposed installation of Cingular antennas, equipment and structures on and    :t
to the existing tower.

4. Cingular also seeks a declaration that the annual radio frequency monitoring
provisions of Section 8.9(8)(a) of the Bylaw are preempted by FCC jurisdiction and therefore
invalid.

## JURISDICTION

5. This Court has subject matter jurisdiction over this action pursuant to (a) Secti·
332(c)(7)(B)(5) of the Telecommunications Act because Cingular has been adversely affected
and aggrieved by the Board of Appeals' denial of its application, and (b) 28 U.S.C. § 1331
because this action presents a federal question under the Telecommunications Act. This actio
appropriately may be brought pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §
2201-2202 (the Declaratory Judgment statute) because an actual controversy exists. The Cou
has supplemental jurisdiction over the Massachusetts state law claims pursuant to 28 U.S.C. §
1367.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Cingular':
claims arose in this judicial district.

## THE PARTIES

7. Cingular is a limited liability company qualified to do business in Massachuset
with a business address of 580 Main Street, Bolton, Massachusetts 01740. Cingular is license

2

by the Federal Communications Commission ("FCC") to provide personal wireless service in areas that include North Andover, Massachusetts.

8.    The Defendant Town of North Andover ("the Town") is a duly constituted municipality in Essex County, Massachusetts, with its principal office located at the Municipɑ Building, 120 Main Street, North Andover, MA 01845.

9.    The Defendant Board is a duly constituted board of the Town with an office located at the Municipal Building, 120 Main Street, North Andover, MA 01845.

10.    The Defendant Ellen P. McIntyre, is the Chair and a member of the Board. Sh resides at 23 Tanglewood Lane, North Andover, MA 01845.

11.    The Defendant Thomas D. Ippolito an associate member of the Board. He res ; at 338 Abbott Street, North Andover, MA 01845.

12.    The Defendant Richard M. Vaillancourt is an associate member of the Board. resides at 454 Stevens Street, North Andover, MA 01845.

13.    The Defendant Richard J. Byers is Clerk and a member of the Board. He resiɗ at 97 Forest Street, North Andover, MA 01845.

14.    The Defendant Joseph D. LaGrasse is Vice-Chair and a member of the Board. ; resides at 40 Sugarcane Lane, North Andover MA 01845.

15.    The Defendant David R. Webster is a member of the Board. He resides at 707 Waverly Road, North Andover, MA 01845.

16.    The Defendant Albert P. Manzi, III, is a member of the Board. He resides at 1 ȝ Salem Street, North Andover, MA 01845.

17.    The Defendant Daniel S. Braese is a member of the Board. He resides at 21 Periwinkle Way, North Andover, MA 01845.

3

18.     Defendant Board members Thomas D. Ippolito, Richard M. Vailancourt, Eller McIntyre and Richard Byers rendered the decision at issue in this case.

19.     Messrs. Ippolito and Vailancourt voted against the requested variance, resultin   ι a denial of the application pursuant to Mass. Gen. Laws c. 40A, § 15.

## THE TELECOMMUNICATIONS ACT OF 1996

20.     Congress has determined that there is a public need for wireless communicatic services such as that provided by Cingular. The Telecommunications Act was intended to "provide for a pro-competitive, de-regulatory national policy framework designed to accelera rapidly private sector deployment of advanced telecommunications and information technolo;   ; to all Americans".

21.     The Telecommunications Act, while preserving certain State and local authori over the placement, construction or modification of wireless facilities, expressly preempts Sta or local governments from regulating such facilities in a manner that prohibits or has the effe(   f prohibiting the provision of personal wireless services, or from unreasonably discriminating among providers of functionally equivalent wireless services. It requires that the decisions of State or local governments concerning any requests for authorization to place, construct or modify wireless facilities must be supported by "substantial evidence."

22.     The Telecommunications Act further prohibits State or local governments fron regulating the placement or construction of wireless service facilities on the basis of perceivec environmental or health effects of radio frequency emissions to the extent that such facilities comply with standards promulgated by the FCC.

## THE SITE

23.     The Site contains an existing, 152 foot tall lattice tower, supported by guy wire

4

owned by SBA Towers, Inc. ("SBA"). The existing tower was permitted in 1958, pursuant to variance. It is painted orange and white in accordance with FAA regulations.

24.    The Site is large (227,996 square feet), topographically higher than the surrounding area, and contains dense woods within which the proposed facilities will be suita concealed from an aesthetic standpoint. It is within a R-3 District under the North Andover Zoning Bylaw.

25.    On June 30, 2000, the North Andover Planning Board issued a special permit,    h conditions, to Sprint Spectrum, LP to install and operate a wireless service facility on the exis     ₃ tower structure at 300 Chestnut Street. Among other things, the Planning Board found that th Site "is an appropriate location for the project as it is being collocated on an existing wireless location" and that the use "will not adversely affect the neighborhood."

## CINGULAR'S PROPOSED FACILITY

26.    Cingular proposes to attach antennas at an antenna centerline height of 120' on    ₃ existing 152' tower. Cingular also proposes to install within the existing fenced compound an approximately 11' x 20' equipment shelter for its ancillary equipment. Coaxial cables will connect the antennas to the base station equipment and the facility will be served by associate power and telephone connections existing at the site.

27.    Cingular's proposal will not increase the height of the existing tower or enlarge    ₃ existing fenced equipment compound.

28.    Currently, there are multiple antennas on the tower including those of Cingular direct competitor, Sprint Spectrum.

29.    The proposed equipment shelter will be concealed to the greatest extent possib by existing trees and vegetation. In addition, the facility will be surrounded by an 8' fence.

5

30. The proposed facility is passive and unobtrusive, requires no employees or customers on the premises, and has no characteristics that are incompatible with nearby properties. It is not located in wetland resource areas or buffer zones, will not include any outdoor storage or any solid waste receptacles, and, because it is unmanned, will not require a means of water supply or sewage disposal.

31. The proposed facility will involve no offensive lighting, odors, smoke, noise, or refuse materials.

32. The proposed facility is consistent with the purpose of North Andover's Wirel Service Facilities Zoning Bylaw Section 8.9.1.a, because it is designed "to minimize the visua and environmental impacts as well as any potential deleterious impact on property value, of wireless services facilities..." and to "encourage appropriate land use, environmental protectic preservation of North Andover's rural character and the provision of adequate infrastructure development in North Andover."

33. The proposed facility would not be detrimental to the neighborhood, would be harmony with the purposes and intent of North Andover's Zoning Bylaw, and would satisfy a f the criteria for the variance requested.

## THE NORTH ANDOVER ZONING BYLAW

34. Section 8.9 of the North Andover Zoning Bylaws governs wireless service facilities in North Andover. It provides that a wireless service facility may be located in any zoning district in the Town upon issuance of a Special Permit with Site Plan Review by the Nc Andover Planning Board, provided the carrier demonstrates that the facility is necessary to provide adequate service to the public and the facility satisfies all of the other requirements of Town's Zoning Bylaw applicable to wireless service facilities (Section 8.9.3.a).

6

35. Section 8.9.3.b provides that wireless service facilities must be located on preexistent structures if feasible unless (a) the applicant can demonstrate to the satisfaction of Special Permit Granting Authority (the Planning Board) that it is not feasible to locate on a preexistent structure and (b) the wireless service facility is "camouflaged to the greatest exten possible."

36. Sections 8.9(3)(c) and 8(9)(4) of North Andover's Zoning Bylaw set forth numerous dimensional and design requirements applicable to wireless service facilities, and Section 8.9(5)(d) sets forth numerous filing requirements.

37. Section 8.9(3) was amended by the citizen-initiated Article 21 of the 2000 Nor Andover Town Meeting to amend setback requirements for wireless facilities. The Attorney General approved the Amendment on October 12, 2000. On information and belief, the amendment took effect after Sprint obtained its Special Permit for the Site.

38. Section 8.9(3)(c)(v)(1) provides in relevant part as follows: "A minimum setb of 600 feet shall be required for all wireless devices, antenna and their mounting structures, whether attached to a new or existing structure, as measured from the adjacent property line o properties which are either zoned for, or contain, residential and or educational uses of any types."

39. Section 8.9(3)(c)(v)(2) also provides as follows: "In the event that a preexister structure is proposed as a mount for a wireless service facility, the setback provisions of the zoning district shall apply. In the case of the preexistent non-conforming structures, wireless service facilities and their equipment shelters shall not increase any non-conformity."

## NEED FOR ADDITIONAL COVERAGE IN NORTH ANDOVER

40. Cingular currently covers certain portions of western North Andover from seve

7

sites. Existing coverage reflects transmissions from the following nearby existing/proposed facilities:

> ➢ Site MA0116, Rooftop facility, 224 Winthrop Avenue (Hampton Inn), Lawrer

> ➢ Site MA0425, Rooftop facility, 23 Main Street, Andover;

> ➢ Site MA3045, Co-Location facility on tower on Boston Hill, North Andover; ⟨

> ➢ Site MA1385, Co-Location facility on tower at Stevens' Estate, 723 Osgood Street, North Andover.

41.     Cingular submitted to the Board a radiofrequency ("RF") report, with coverag charts, demonstrating (a) the need for the facility at the Site, (b) the coverage it will provide, ⟨ (c) the other existing Cingular's facilities in North Andover and outside North Andover withii one mile of its boundary.

42.     As demonstrated by the submitted coverage maps, without the proposed facilit    t this Site, Cingular will be unable to provide adequate indoor and in-vehicle coverage – and w therefore continue to have a significant gap in coverage – in this area of North Andover ("Coverage Gap").

43.     Cingular's existing facilities in the towns surrounding North Andover and its t approved facilities in North Andover provide only limited coverage in parts of North Andove These facilities leave a significant gap in coverage in the area of the Coverage Gap at issue he

44.     To test the existence of a coverage gap, the Board hired (at Cingular's expense Mark Hutchins, an independent consultant.

45.     Mr. Hutchins evaluated coverage in the Coverage Gap and confirmed that there are "significant gaps in Cingular's North Andover coverage, particularly along Salem Turnpik (Route 114) near Andover Bypass, and nearby residential areas to the north and east." He

8

calculated that the proposed facility would "remedy" the gap "over an area just over 1.2 squa
miles."

46.     None of Cingular's existing or approved sites provides or is capable of provid
Cingular coverage to the portions of North Andover that would be served by the proposed fac    y
at the Site. Mr. Hutchins concurred: "These gaps are unable to be remedied by the use of exi:    g
cells; this justifies a new facility in this area which, through collocation on the SBA tower,
enables closing much of the gap without building a new support structure."

47.     The Coverage Gap includes high-demand areas in which Cingular currently la
adequate communications service.

48.     The proposed facility would also help to provide a smooth transition with exist    ;
sites to which it would provide a coverage link.

49.     There is no other suitable preexisting structure in this area of North Andover u    ι
which to locate a wireless service facility. Nor has Cingular identified any superior alternativ
site that would enable it to provide quality coverage in the Coverage Gap.

## THE PROCEEDINGS BEFORE THE BOARD

50.     On December 2, 2004, Cingular's consultant submitted a Building Permit
application to the North Andover Building Department, seeking to collocate antennas on the
existing tower at the Site, with equipment in a shelter in the existing compound at the base of
tower.

51.     On December 9, 2004, the Building Inspector of North Andover denied the
Building Permit, because he ruled that the proposal required both a special permit from the
Planning Board and a setback variance from the Zoning Board of Appeals.

52.     Therefore, pursuant to G.L. c. 40A, § 10, and Section 10.4 of the North Andovι

9

Zoning Bylaw, Cingular submitted an application to the Board on January 10, 2005, for a variance from the 600' setback provision, section 8.9(3)(c)(v) of North Andover's Wireless Service Facilities Zoning Bylaw.

53.     The Board of Appeals initially noticed a public hearing on Plaintiff's applicati on February 8, 2005, and continued the matter to April 12, May 12, June 14, July 12 and Aug 9, 2005.

54.     During the hearings, Cingular presented its plans, radio frequency analysis, ra( frequency maps, a certification by a structural engineer, dated February 17, 2005, of the struc    il integrity of the existing tower to support the proposed Cingular installation, and proof of compliance with FCC radio frequency emissions regulations.

55.     Cingular also presented other material demonstrating that literal compliance w Section 8.9(3)(c)(v) would cause substantial hardship due to the topography and shape of the and due to existing structures on the lot.

56.     The lot's unique combination of high terrain, large size and existing tower is n shared by other lots in the district. Indeed, the lot is the only one in the district that would per coverage to this area of North Andover in compliance with the Bylaw's preference (Section 8.9.3.b) for location of wireless antennas upon existing structures. To deny needed coverage t the Coverage Gap from the Site would cause substantial hardship to Cingular in its FCC-licen mission to provide coverage, and would cause financial hardship to the tower owner, SBA.

57.     The Board did not contest that, as Cingular stated by letter of May 6, 2005, den of the variance would "would prevent Cingular from (a) providing effective wireless communications services to its existing and potential customers in North Andover in an area where it currently has inadequate coverage, (b) satisfying the mandate of, and realizing the rig

10

granted by, its federal license and the federal statute and regulations pursuant to which the lic    e

was issued, and (c) improving competition in the telecommunications industry as provided fo

the Federal Telecommunications Act of 1996 (at least one other wireless communications

provider – Sprint – has already been permitted to install a facility on this tower)."

58.    Cingular's evidence showed that its proposed facility would comply with the

intent and purpose of the bylaw justifying a variance from Section 8.9(3)(c)(v). It would

minimize the number of towers in Town by using an existing communications tower, would r

materially increase any adverse visual impact of the existing tower, would comply with feder

regulations regarding transmissions and exposure to radiofrequency emissions, and would be

unobtrusive, requiring after installation only about one trip per month for routine maintenance

59.    Cingular also pointed out that the Board should consider the Telecommunicati

Act in deciding whether to grant a variance, because, among other things, the "Board cannot ι    y

a variance if in doing so it would have the effect of prohibiting wireless services. ... In other

words, the need for closing a significant gap in coverage, in order to avoid an effective

prohibition of wireless services, constitutes another unique circumstance when a zoning varia

is required." Nextel Communications of the Mid-Atlantic, Inc. v. Town of Wayland, 231 F.S    ι.

2d 396, 406-407 (D. Mass. 2002).

60.    During the Board's hearings, various citizens voiced objections to the propose

facility including, without limitation, "health issues," that would purportedly result from allov    ζ

the proposed FCC-licensed facility to operate, despite the undisputed evidence that radio

frequency emissions from the proposed facility would only be a small fraction of the allowed

exposure limit under FCC regulations. The total exposure from all antennas on the tower wou

not exceed 3.7% of FCC-allowed limits, of which Cingular's proposed facility would contribι

11

less than 0.6% of the limits. Mr. Hutchins agreed that "cumulative exposure from the propos

facility is certain to be well below [FCC] guidelines for human exposure to RF radiation as lo

as tower access is restricted."

61.     The Board deliberated on August 9, 2005, after which it voted 2 to 2 on a moti

to grant the requested variance. The vote operated as a denial, because Mass. Gen. Laws c. 4(

§ 10 requires a supermajority of four votes in these circumstances to approve a variance.

62.     On August 23, 2005, the Board filed its Decision with the Town Clerk.

63.     In its Decision, the Board cited as justification for its denial only the boilerplat

that "a literal enforcement of the dimensional provisions of the ordinance would not involve

substantial hardship, financial or otherwise, to the petitioner, that desirable relief may not be

granted without substantial detriment to the public good, and that desirable relief may not be

granted without nullifying or substantially derogating from the intent or purpose of" the Bylav

64.     The Board's Decision did not specify any alleged detriment to the public good

any derogation from the intent or purpose of the Bylaw that would result from placement of ar

additional set of antennas on an existing communications tower already used by Cingular's

competitor.

65.     Nor did the Board discuss any Telecommunications Act issue, let alone whethe

Cingular needed the Site to close a substantial gap in coverage within the Coverage Gap,  whe

denial of this application would effectively prohibit Cingular from providing coverage in the

Coverage Gap, or whether denial would unreasonably discriminate against Cingular while its

direct competitor enjoys unrestricted use of the tower facility.

66.     Neither the generalized concerns expressed in the Board's Decision nor any

12

specific issue mentioned during the deliberations constitutes a valid basis for denying the requested variances.

## IRREPARABLE HARM

67.    By denying Cingular the right to install and operate its essential telecommunications facility, the Board has effectively prohibited Cingular from covering an existing significant gap in coverage within North Andover.

68.    By denying Cingular the right to use the Site, while Sprint transmits and receiv wireless communications signals from the existing tower on the Site, the Board has harmed Cingular in its efforts to compete with Sprint, and has harmed competition in the wireless communications industry generally.

69.    As a result, Cingular has suffered and continues to suffer irreparable harm by being denied and delayed the opportunity to install and operate its facility at Site and by being placed at a competitive disadvantage compared to Sprint, which already operates from the Sit

## COUNT I
## (Telecommunications Act of 1996 - Effective Prohibition)

70.    Cingular repeats and realleges the allegations of paragraphs 1-69, above.

71.    The Telecommunications Act provides in relevant part that "The regulation of placement, construction, and modification of personal wireless service facilities by any State (local government or instrumentality thereof – (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i).

72.    The North Andover Zoning Bylaw and the Board's denial of Cingular's application for variances "prohibit[s] or ha[s] the effect of prohibiting the provision of persona wireless services," in those areas of the Town that cannot receive wireless communication

13

coverage if the proposed facility is not constructed, in violation of Section 332(c)(7)(B)(i)(II) the Act.

73.     The existence of a Coverage Gap, and the need to cover that gap from the Site were undisputed and indisputable.

74.     Yet, the Decision and section 8.9(c)(v) of the Bylaw prohibit use of the only structure complying with the Bylaw's stated preference to use existing structures, and no othe property appears zonable for a wireless facility to cover this Coverage Gap.

75.     Indeed, as a matter of mathematics (area = $\Pi R^2$), the 600' setback in Bylaw Section 8.9(c)(v) requires a minimum lot size of over 1,130,000 square feet – about 26 acres. Beyond that, any proposed facility would still have to comply with the restrictive provisions ( the remainder of the Bylaw.

76.     For these and other reasons stated above, the Court should declare that the Nor Andover Zoning Bylaw and the Board's Decision violate the prohibition of § 332(c)(7)(B)(i) ‹ its face and as applied.

## COUNT II
### (Telecommunications Act of 1996 – Unlawful Discrimination)

77.     Cingular repeats and realleges the allegations of paragraphs 1-76, above.

78.     The Act provides in relevant part that "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof – (I) shall not unreasonably discriminate among provid( of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i).

79.     The Bylaw and the Decision of the Board violate this prohibition.

80.     Without limitation, the Board's denial of Cingular's application to collocate on     ɪ

14

existing tower on which Sprint Spectrum already operates a wireless communication fa    y

"unreasonably discriminate[s] among providers of functionally equivalent services", in viol    n

of Section 332(c)(7)(B)(i)(I) of the Act.

## COUNT III
### (Telecommunications Act of 1996 - No Substantial Evidence for Denial)

81.    Cingular repeats and realleges the allegations of paragraphs 1- 80, above.

82.    The Telecommunications Act provides that "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify persona wireless service facilities shall be in writing and supported by substantial evidence contained i written record."  47 U.S.C. § 332(c)(7)(B)(iii).

83.    The Board's denial of Cingular's application is not supported by substantial evidence, in violation of this requirement.

84.    Without limitation, there was no substantial evidence refuting the existence of a substantial gap in coverage, the ability of the proposed site to cover more than 1.2 acres of the Coverage Gap, the absence of any other existing structure that could cover the Coverage Gap, absence of any other zonable alternative, the lack of detriment to the neighborhood, the unique characteristics of the Site and existing tower structure, or the proposal's conformity to the purposes of the North Andover Zoning Bylaw.

85.    Moreover, the Board's failure even to consider the requirements of the Telecommunications Act left it without any findings or evidence that would warrant denial of a variance.

## COUNT IV
### (Telecommunications Act of 1996 - Improper Basis)

86.    Cingular repeats and realleges the allegations of paragraphs 1-85, above.

15

87.    The Telecommunications Act provides in relevant part that "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the bases of the environmental effects o radio frequency emissions to the extent that such facilities comply with the Commission's regulations, concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). The proposed installation fully complies with those regulations. The term "environmental effects" as used i this section includes health effects.

88.    The Board's denial of the variances requested by Cingular on the basis of a 60( setback in a zoning bylaw, which was adopted at the behest of citizens of the Town based upo perceived health effects, as reinforced by public comments at the hearings expressly invoking alleged health effects of an FCC-compliant facility, violates this requirement.

## COUNT V
## (M.G.L. c. 40A, Section 17)

89.    Cingular repeats and realleges the allegations of paragraphs 1-88, above.

90.    The Board's denial of Cingular's application is arbitrary and capricious, exceed the Board's authority under Massachusetts General Laws Chapter 40A, lacks sufficient finding and is based on errors of law.

## COUNT VI
## (State Law: Unconstitutional As-Applied)

91.    Cingular repeats and realleges the allegations of paragraphs 1-90 above.

92.    Under the Massachusetts Constitution, a zoning bylaw, though valid generally, may be unconstitutional as applied to a particular parcel of land when, due to the peculiarities the parcel, application of the by-law is unnecessary to accomplish the public purpose for which the by-law was created.

16

93.    Here, the Site has a glaring "peculiarity" – an existing telecommunications tov
already serving a wireless carrier and numerous other broadcasters.

94.    Because of the existing tower and lawful communication uses at the Site, there
no public purpose served by prohibiting another wireless carrier from mounting a facility on ε
next to the existing tower, on the supposed ground that 600' of separation is required betweer
wireless facilities and a residential lot line, as Section 8.9.(3)(c)(v) purports to do.

## COUNT VII
## (Declaratory Judgment)

95.    Cingular repeats and realleges the allegations of paragraphs 1-94, above.

96.    Sections 8.9.(3)(c)(v) of the Zoning Bylaw (600' setback from a residential
property line) is unlawful and invalid as applied to this application and on its face.

97.    Without limitation, that provision (a) violates the Telecommunications Act of
1996, as set forth in Counts I through IV,  (b) serves no valid public purpose (and is therefore
unconstitutional under state and federal law) as applied to additional attachments to an existin
telecommunications tower, (c) is void for vagueness in general and/or as applied here, and (d)
conflicts with the uniformity requirement of G.L. c. 40A, section 4 ("Any zoning ordinance or
by-law which divides cities and towns into districts shall be uniform within the district for eac
class or kind of structures or uses permitted").

98.    Because Section 8.9.(3)(c)(v) has no purpose beyond effectuating supposed hea
based objections to the environmental emissions of a facility that complies with FCC
radiofrequency emissions regulations, it is preempted by federal law on its face and as applied

## COUNT VIII
## (Declaratory Judgment – Preemption Of RFR Monitoring by FCC Jurisdiction)

99.    Cingular repeats and realleges the allegations of paragraphs 1 – 98 above.

17

100. Section 8.9(8)(a) of the North Andover Bylaw purports to regulate radio frequ    y
emissions from federally licensed wireless telecommunications facilities by requiring "RFR
[radiofrequency radiation] measurements . . . at annual intervals from the date of issuance of
Special Permit."

10.1 This regulation purports to apply not only to the Site, but to all existing sites o    l
wireless carriers.

102. Through this section, the Town of North Andover purports to regulate a field t
Congress has reserved exclusively to the FCC.

103. In the Communications Act of 1934, Congress granted the field of regulating r    ɔ
frequency transmissions exclusively to the FCC. See, e.g. 47 U.S.C. §§ 152(a), 301.

104. The Communications Amendments Act of 1982 confirmed and strengthened tł
FCC's federal authority over radio frequency emissions. See 47 U.S.C. § 302(a). H.R. Conf.
Rep. No. 97-765, at 23, 33 (1982), reprinted in 1982 U.S.C.C.A.N. 2261, 2267, 2277.

105. Pursuant to its statutory authority, the FCC has promulgated regulations setting
forth both exposure limits for RF emissions and specific mechanisms for enforcing those
exposure limits. In doing so, it has expressly refrained from imposing unnecessary and
burdensome requirements upon carriers, consistent with Congress' intention to make competit    ,
cost-effective communications services available to all Americans.

106. The FCC has promulgated RF exposure limits in 47 CFR 1.1310. According to
Table 1 in that regulation, the exposure limit in the 1900 MhZ band, one of the bands in whicł
Cingular operates, is 1 milliwatt (1,000 microwatts) per square centimeter – many times greate
than the actual maximum exposure at ground level from Cingular's facilities in North Andove

18

The MPE limits are calculated assuming the maximum power density with *all channels* opera     g
at their *maximum* power.

107.    The FCC also expressly regulates when a routine compliance evaluation regar    y
these limits is and is not required: "A determination of compliance with the exposure limits i
Sec. 1.1310 or Sec. 2.1093 of this chapter (**routine environmental evaluation**), and preparat
of an EA if the limits are exceeded, is necessary **only for facilities, operations and transmit**    s
**that fall into the categories listed in table 1**, or those specified in paragraph (b)(2) of this
section. **All other facilities, operations and transmitters are categorically excluded from**
**making such studies** or preparing an EA, except as indicated in paragraphs (c) and (d) of this
section [relating to environmental assessments ("EA"), not to routine evaluation]."  47 C.F.R.
1.1307(b)(1) (emphasis added).

108.    The applicable table in 47 C.F.R. 1.1307(b) shows that PCS facilities are
categorically excluded from routine evaluation as long as they are 10 meters (approximately 3
feet) above ground:

Table 1 - Transmitters, Facilities and Operations Subject to Routine Environmental Evaluation

| Service (title 47 CFR rule part) | Evaluation required if: |
|---|---|
| Personal Communications Services (part 24) | . . .    (2) Broadband PCS (subpart E): non-buildin mounted antennas: height above ground level to lowe point of antenna, 10m and total power of all channels =2000 W ERP (3280 W EIRP) . . . |

109.    All of Cingular's non-building mounted antennas in North Andover (including i
Site) are much more than 10 meters AGL.

110.    Carriers on a multi-carrier telecommunications tower (like the Site) only have
responsibility for correcting any excessive RF emissions from the entire tower if their power

19

density levels contribute 5% or more of the exposure limit applicable to the tower. 47 C.F.R. 1.1307(b)(3).

111.    Based upon worst-case calculations at the Site, Cingular would contribute less than or equal to 0.6% of the total exposure limit.

112.    The purpose of the FCC RF evaluation regulations is "to provide a proper bala between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address grow ; marketplace demands." 62 Fed. Reg. 47960, 47961 (9/12/97).

113,    "Use of the new guidelines will ensure that the public and workers receive adequate protection from exposure to potentially harmful RF electromagnetic fields." Id. at 47962.

114.    Local zoning provisions having the "intent and effect ... to regulate the operatic - not the placement, construction and modification - of licensed facilities" are preempted becaus they focus on "radio frequency regulation rather than local land use concerns" (In Re Cingular Wireless, L.L.C, 2003 WL 21517835, FCC Docket No. 02-100 (July 7, 2003) at page 10-11).

115.    Nor are preempted local regulations saved by the claim that the local governme is attempting to "assure itself that a carrier is complying with FCC standards" where the regulation is "effectively regulating federally licensed operation" as opposed to "traditional zoning regulation of the physical facility." Id.

116.    The annual RFR measurement requirement of North Andover Bylaw Section 8.9(8) is therefore preempted in its entirety.

WHEREFORE, Cingular requests that this Court enter judgment:

1.    Declaring that the North Andover Bylaw and the Board's Decision violate the

20

Telecommunication Act of 1996;

2.  Granting temporary, preliminary, and permanent injunctive relief ordering that Cingular be permitted immediately to install its proposed facility in accordance with its application and plans therefor;

3.  Annulling the portion of the Board's Decision denying Cingular's application for variances;

4.  Declaring that Section 8.9.(3)(c)(v) of the Zoning Bylaw (600' setback from a residential lot line) is unlawful and invalid as applied and on its face;

5.  Declaring that Section 8.9(8)(a) is preempted and invalid as applied to facilities exempt from annual review under FCC regulations.

6.  Ordering the Board to issue the requested variances and all other zoning relief necessary for the proposed facility;

7.  Awarding Cingular reasonable attorneys' fees and costs; and

8.  Awarding Cingular such other and further relief as the Court deems just and proper.

The Plaintiff
By its attorneys,

Stephen D. Anderson (BBO #018700)
Douglas H. Wilkins (BBO #528000)
Scott Lacy (BBO #633323)
ANDERSON & KREIGER LLP
43 Thorndike Street
Cambridge, MA 02141
(617) 252-6575

Dated: September 21, 2005

g:\docs\cin\ma\northandoverchestnut\p\fed-complaint01.doc

21



**Town of North Andover**           Town Clerk        e Stamp
**Community Development and Services Division**
**Office of the Zoning Board of Appeals**
400 Osgood Street
North Andover, Massachusetts 01845

Raymond Santilli,
Interim Community            Telephone   (978) 688-9541
Development Director         Fax         (978) 688-9542

Any appeal shall be filed within          **Notice of Decision**
(20) days after the date of filing             **Year 2005**
of this notice in the office of the
Town Clerk, per Mass. Gen. L. ch.
40A, §17.                        **Property at: 300 Chestnut Street**

| NAME: | Cingular Wireless LLC, 580 Main Street, Bolton, MA 01740 | HEARING(S): | February 8, April 12, May 12, June 14, July 12, & August 9, 2 |
|---|---|---|---|
| ADDRESS: | for premises at: 300 Chestnut Street | PETITION: | 2005-001 |
| | North Andover, MA 01845 | TYPING DATE: | August 11, 2005 |

The North Andover Board of Appeals held a public hearing at its regular meeting on Tuesday, August 9, 2005 at 7:30 PM in the Town Hall top floor meeting room, 120 Main Street, North Andover, Massachusetts upon the application of **Cingular Wireless LLC**, 580 Main Street, Bolton, MA 01740, for premises at: **300 Chestnut Str** North Andover, requesting a dimensional Variance from Section 8, Paragraph 8.9(3)(c)(v) of the Zoning Bylaw, minimum requirements of the distance to lot lines, in order to install additional antennas on the existing antenna tower. Said premise affected is property with frontage on the East side of Chestnut Street within the R-3 zoning district. The legal notices were published in the Eagle Tribune on January 24 & January 31, 2005.

The following voting members were present: Ellen P. McIntyre, Richard J. Byers, Thomas D. Ippolito, and Rich M. Vaillancourt. The following non-voting members were present: Joseph D. LaGrasse and David R. Webster.

Upon a motion by Richard J. Byers and 2ⁿᵈ by Richard M. Vaillancourt, the Board voted to grant the dimensiona Variance from Section 8, Paragraph 8.9(3)(c)(v), minimum requirements of the distance to the lot lines in order t install additional antennas on the existing antenna tower.

Voting in favor of the motion: Ellen P. McIntyre and Richard J. Byers.
Voting to deny the motion: Thomas D. Ippolito and Richard M. Vaillancourt.

The Board finds that the motion for the Variance petition failed to receive the required super majority of four vot per Mass. Gen. L ch. 40A §15. The Board finds that the applicant was requested to address the issue of hardshir general as well as hardship as it pertains to soil, shape, and topography during the April 12, 2005 hearing. The applicant provided the May 6, 2005 written response and the May 12, 2005 verbal response during the hearing tc issue of hardship as it pertains to gap coverage, but not to soil, shape and topography. The Board finds that owir circumstances relating to the soil conditions, shape, or topography of the land or structures, and especially affect such land but not affecting generally the zoning district in which it is located, a literal enforcement of the dimensional provisions of the ordinance would not involve substantial hardship, financial or otherwise, to the petitioner, that desirable relief may not be granted without substantial detriment to the public good, and that desirable relief may not be granted without nullifying or substantially derogating from the intent or purpose of th Bylaw as stated in Section 1 and Section 10, Paragraph 10.4.

                                Town of North Andover
                                Board of Appeals,

ATTEST:
A True Copy
*Joyce A. Bradshaw*

Town Clerk

                                *Ellen P. McIntyre*
                                Ellen P. McIntyre, Chair
                                Decision2005-001.
                                M98.CP2.